UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| In re:<br><br>BLACK NEWS CHANNEL, LLC,[1]<br><br>Debtor. | Case No. 4:22-bk-40087-KKS<br><br>Chapter 11 |

**DEBTOR'S MOTION TO REJECT BUSINESS ADVISORY AGREEMENT, DATED JULY 10, 2021, BETWEEN DEBTOR AND PROGRESS PARTNERS IB, INC. AND APPLIED CAPITAL, LLC, EFFECTIVE AS OF PETITION DATE**

Debtor Black News Channel, LLC ("BNC" or the "Debtor"), by and through its undersigned counsel, makes this motion (the "Motion"), pursuant to sections 105(a) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the Debtor to reject its executory contract with Progress Partners, a copy of which is attached hereto as **Exhibit B**, effective as of the Petition Date, and granting related relief.  In support of this Motion, the Debtor respectfully states:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference from the United States District Court for the Northern District of Florida, dated June 5, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1] The Debtor's address is 2320 Killearn Center Blvd., Building D, Tallahassee, Florida 32309.  The last four digits of the Debtor's federal tax identification number are 5082.

2. The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought herein are sections 105(a) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

## Background

5. On March 28, 2022 (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 12, 2022, the United States Trustee for Region 21 (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in this chapter 11 case (the "Committee"). No trustee or examiner has been appointed or requested in this chapter 11 case.

6. Initially formed as a Florida limited liability company in 2004, BNC launched operations as the nation's first news channel dedicated to covering the unique perspectives, challenges and successes of Black and Brown communities in February 2020. Based in Tallahassee, Florida, BNC has state of the art news studios located in its Tallahassee headquarters and in Washington, DC.

7. Additional information concerning, among other things, BNC's finances and operations can be found in the *Declaration of Maureen Brown in Support of Chapter 11 Petition and First Day Relief* (Docket No. 60) (the "First Day Declaration").

**I.      The Business Advisory Agreement**

8.      As further detailed in the First Day Declaration, since it began broadcasting in February 2020, the Debtor has struggled to be profitable and its operating expenses have been significantly higher than anticipated.  Notwithstanding the significant capital infusions provided by Mr. Shahid Khan, through Beatnik Investments, LLC, and Busey Bank, BNC continuously required additional cash in order to meet its constantly increasing expenses, and to simultaneously help the business grow.

9.      By the summer of 2021, it was becoming increasingly evident that for BNC to realize upon its corporate vision, it would require substantial additional capital beyond that which Mr. Khan and Beatnik were prepared to provide.  To assist BNC with its efforts, BNC sought to engage a reputable investment banker to, among other things, develop and implement a comprehensive process to identify, engage with, and negotiate terms with additional potential minority or majority investors.  Accordingly, BNC executed that certain Business Advisory Agreement, dated July 10, 2021 (as amended, the "<u>Business Advisory Agreement</u>"),[2] with Progress Partners IB, Inc. and/or Applied Capital, LLC[3] (collectively, "<u>Progress Partners</u>").

10.     The Business Advisory Agreement required Progress Partners to provide, among other things, a range of advisory services to the Debtor, including planning for a potential Transaction involving the Debtor, preparing and distributing marketing materials to potentially interested parties, and facilitating the negotiation and closing of a potential Transaction. Business Advisory Agreement § 2.  In exchange, the Debtor agreed to pay Progress Partners monthly Consulting Fees, and a Transaction Fee set as a percentage of any Transaction Proceeds

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Business Advisory Agreement.

[3]      The Business Advisory Agreement designates Progress Partners IB, Inc. or Applied Capital, LLC as the counterparty "Advisor" depending upon the type of transaction (if any) that was ultimately pursued by the Debtor.

obtained by the Debtor in connection with any Transaction consummated with a third party contacted by Progress Partners prior to the termination of the Business Advisory Agreement, and for a Tail Period of 12 months thereafter.[4]  *Id.* § 4.

## II. Progress Partners' Prepetition Marketing Efforts

11. In connection with, and pursuant to, the Business Advisory Agreement, in 2021 Progress Partners conducted market outreach to parties that may have potential interest in pursuing a transaction with the Debtor.  At the time, consistent with the Debtor's goals and the state of BNC's business, Progress Partners' efforts were focused on soliciting third party interest in investing in, or pursuing a strategic partnership with, the Debtor.  Unfortunately, Progress Partners' efforts on the Debtor's behalf ultimately proved to be unsuccessful.

12. In the first quarter of this year, liquidity became increasingly tight for BNC, which continued to experience substantial operating losses. Although BNC continued to work diligently to secure alternate funding sources, those efforts did not bear fruit.  Eventually, on March 25, 2022, BNC found itself with inadequate funds on hand to make a scheduled payroll to its employees.  This, in turn, led to the difficult decision by BNC to substantially scale down its operations and to reduce its workforce to a core group of employees.

13. Initially, it appeared that BNC would have no choice but to pursue the prompt winding down of its business and liquidation of its assets.  However, over the course of the day on March 25, 2022, as word spread through other media outlets and over social media of the impending shutdown of the only provider of 24/7 multiplatform news programming dedicated to serving the nation's Black and Brown communities, an entirely unexpected development arose.

---

[4] The summary of the terms of the Business Advisory Agreement contained in this Motion is qualified in its entirety by reference to the Business Advisory Agreement itself, which shall control in the event of any conflict.

BNC's representatives began to receive multiple inbound inquiries from credible parties expressing interest in pursuing potential sale or other transactions with the company. Recognizing that fate had presented BNC with at least the chance to try to preserve the mission and the enterprise to which so many had committed themselves and their resources over the last several years, BNC's remaining leadership team, in consultation with the company's advisors, quickly moved to position the company to pursue a potential sale or other value maximizing transaction.

14. Meanwhile, on the morning of March 28, 2022, BNC received by email a communication from the investment banker leading the Progress Partners engagement which summarized various actions undertaken by Progress Partners during its engagement and which attached a document labeled "Progress Black News Channel Final Campaing [sic] Summary", and bearing the dates December 1, 2021 to March 25, 2022.

### III. The Debtor's Selection of Ankura and the Contemplated Post-Petition Marketing Process

15. As further detailed in the First Day Declaration, one of the Debtor's primary goals in this chapter 11 case is to maximize value for its creditors, through a sale or other transaction. Based on the information currently available to the Debtor and its advisors, the Debtor believes that its best chance to realize this goal is through a going concern or turnkey sale of substantially all of its assets and business that, in addition to maximizing value, may preserve (and potentially restore) jobs and allow the Debtor's socially important mission to continue. To accomplish its goals in this proceeding, the Debtor determined it was appropriate to retain an advisory firm with significant experience in running marketing and sales processes in the context of chapter 11 bankruptcy proceedings. In view of, among other considerations, the lengthy, but ultimately unsuccessful, campaign that had been conducted for BNC prepetition, the Debtor's need for

restructuring consulting services in addition to the sale-related financial advisory services, and the recent communication from Progress Partners indicating that it viewed its campaign on behalf of BNC to be completed as of March 25, 2022, the Debtor looked elsewhere for the professional services it needed in connection with the sale and restructuring activities contemplated for its chapter 11 case.

16. Immediately before its bankruptcy filing and during the first week after the Petition Date, the Debtor contacted or communicated with at least six potential candidates to provide it with the restructuring consulting and financial advisory services the Debtor requires in connection with its chapter 11 proceeding. After interviewing several of the candidates it had identified, the Debtor determined that Ankura Capital Advisors, LLC ("Ankura" or "ACA"), a nationally respected and reputable financial advisory and investment banking firm, would be best-suited to fill this role, and will afford the Debtor the best possible chance at achieving a value-maximizing transaction in this chapter 11 case. The Debtor also selected ACA's affiliate, Ankura Consulting, LLC (together with ACA, the "Ankura Entities"), to provide the Debtor with certain restructuring consulting services. The Debtor is contemporaneously filing an application with the Court requesting authority to employ the Ankura Entities as its financial advisor and restructuring consultant, as applicable.

17. To be clear, since the Petition Date, the Debtor has not requested that Progress Partners provide it with any further services, or otherwise induced any further performance by Progress Partners under the Business Advisory Agreement, in connection with this chapter 11 case or otherwise.

**Requested Relief**

18. Because the Debtor, in the exercise of its informed business judgment, has determined to engage and request approval from this Court to employ another professional

services organization to provide it with its financial advisory and investment banking services in connection with this chapter 11 case, the Debtor has no further need for Progress Partners' services. Accordingly, to the extent, if any, that the Business Advisory Agreement was an executory contract as of the Petition Date, by this Motion, the Debtor seeks an order, pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, authorizing the Debtor to reject the Business Advisory Agreement effective as of the Petition Date.

## Basis for Relief

**I.       Rejection of the Business Advisory Agreement Should be Authorized as a Sound Exercise of the Debtor's Business Judgment.**

19.     Section 365 of the Bankruptcy Code permits a debtor to assume or reject an executory contract, subject to court approval. 11 U.S.C. § 365(a). "[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."); *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994) (section 365 "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed").

20.     In assessing a debtor's decision to reject an executory contract, bankruptcy courts apply the business judgment test. *In re Surfside Resorts & Suites*, 325 B.R. 465, 469 (Bankr. M.D. Fla. 2005) (citing *In re Prime Motor Inns*, 124 B.R. 378, 381 (Bankr. M.D. Fla. 1991)); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well

Case 22-40087-KKS    Doc 117    Filed 04/15/22    Page 8 of 10

established that 'the question whether a lease should be rejected . . . is one of business judgment.'") (quoting *Grp. of Institutional Inv'rs v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943)). "The business judgment test requires a showing that rejection of the contract will likely benefit the [bankruptcy] estate." *In re Colony Beach & Tennis Club Ass'n, Inc.*, 2010 WL 746708, at *3 (M.D. Fla. Mar. 2, 2010) (citing *In re H.M. Bowness, Inc.*, 89 B.R. 238, 241 (Bankr. M.D. Fla. 1988)); *see also N.L.R.B. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."), *aff'd*, 465 U.S. 513 (1984). The bankruptcy court does not substitute its own judgment for that of the debtor; rather, courts approve the debtor's decision to reject unless that decision is the product of "bad faith, whim, or caprice." *Surfside Resort*, 325 B.R. at 469 (quoting *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985)) (internal punctuation omitted); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

21. Rejection of the Business Advisory Agreement is a sound exercise of the Debtor's business judgment. Following Progress Partners' unsuccessful search for potential investment partners or partnership opportunities in 2021 and early 2022, and with no actionable transaction opportunities on the table, the Debtor was forced to make the difficult decision to scale back its operations and workforce and commence this chapter 11 case. As part of these chapter 11 proceedings, the Debtor intends to pursue a prompt sale of its business or other value maximizing transaction. To that end, for the reasons explained in this Motion, the Debtor has determined that it no longer requires the services of Progress Partners.

8

established that 'the question whether a lease should be rejected . . . is one of business judgment.'") (quoting *Grp. of Institutional Inv'rs v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943)). "The business judgment test requires a showing that rejection of the contract will likely benefit the [bankruptcy] estate." *In re Colony Beach & Tennis Club Ass'n, Inc.*, 2010 WL 746708, at *3 (M.D. Fla. Mar. 2, 2010) (citing *In re H.M. Bowness, Inc.*, 89 B.R. 238, 241 (Bankr. M.D. Fla. 1988)); *see also N.L.R.B. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."), *aff'd*, 465 U.S. 513 (1984). The bankruptcy court does not substitute its own judgment for that of the debtor; rather, courts approve the debtor's decision to reject unless that decision is the product of "bad faith, whim, or caprice." *Surfside Resort*, 325 B.R. at 469 (quoting *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985)) (internal punctuation omitted); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

21.    Rejection of the Business Advisory Agreement is a sound exercise of the Debtor's business judgment. Following Progress Partners' unsuccessful search for potential investment partners or partnership opportunities in 2021 and early 2022, and with no actionable transaction opportunities on the table, the Debtor was forced to make the difficult decision to scale back its operations and workforce and commence this chapter 11 case. As part of these chapter 11 proceedings, the Debtor intends to pursue a prompt sale of its business or other value maximizing transaction. To that end, for the reasons explained in this Motion, the Debtor has determined that it no longer requires the services of Progress Partners.

22. Accordingly, the Debtor, in consultation with its advisors, has determined that it is appropriate to reject the Business Advisory Agreement, and proceed with, subject to Court approval, the retention of Ankura. Rejection of the Business Advisory Agreement will directly benefit the Debtor's estate by, among other things, (1) allowing it to proceed with its proposed chapter 11 sale process in earnest with Ankura and without the potentially duplicative services of Progress Partners and (2) freeing the Debtor from any corresponding obligation to pay Progress Partners any additional Consulting Fees or Transaction Fees moving forward, including any Transaction Fee payable during the Tail Period in connection with any transaction ultimately achieved by the Debtor and Ankura in this chapter 11 case.[5] For the foregoing reasons, rejection of the Business Advisory Agreement is a sound exercise of the Debtor's business judgment, and should be approved. Moreover, given that the Debtor has not requested that Progress Partners provide it with any postpetition services, the Debtor respectfully requests that the Business Advisory Agreement be deemed rejected effective as of the date of the Petition Date.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

23. To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

*[Remainder of Page Intentionally Blank]*

---

[5] To the extent that Progress Partners asserts any claim in the Debtor's bankruptcy case arising out of or relating to the Business Advisory Agreement, including any claim for breach thereof, the Debtor reserves all rights, defenses, and counterclaims.

WHEREFORE, Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtor to reject the Business Advisory Agreement and granting such other relief as is appropriate.

Dated: April 15, 2022

**THAMES | MARKEY**
Richard R. Thames
Bradley R. Markey
Florida Bar Number 0718459
Florida Bar Number 0894213
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@thamesmarkey.law
brm@thamesmarkey.law

-and-

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

 /s/ *Gregory W. Werkheiser*
Gregory W. Werkheiser (*pro hac vice*)
Steven L. Walsh (*pro hac vice*)
1313 N. Market Street, Suite 1201
Wilmington, DE 19801
Phone: (302) 442-7010
Fax: (302) 442-7012
gwerkheiser@beneschlaw.com
swalsh@beneschlaw.com

-and-

Scott A. McMillin (*pro hac vice*)
Matthew E. Nirider (*pro hac vice*)
71 S. Wacker Dr., Suite 1600
Chicago, IL 60606
Phone: (312) 212-4949
Fax: (312) 767-9192
smcmillin@beneschlaw.com
mnirider@beneschlaw.com

*Proposed Counsel for the Debtor*